## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **MELISSA M. PITMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:18-cv-00258-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Nancy A. Berryhill,* | ) | |
| *Acting Commissioner of SSA,* | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Melissa M. Pitman appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for disability insurance benefits ("DIB").[1] (DE 1). For the following

reasons, the Commissioner's decision will be AFFIRMED.

## I. FACTUAL AND PROCEDURAL HISTORY

Pitman initially applied for DIB in January 2009, alleging disability as of July 24, 2007.

(DE 10; DE 22; DE 23 Administrative Record ("AR") 862). After an administrative hearing

(AR 108-34), Pitman's application was denied by administrative law judge Jennifer Fisher in a

decision dated December 13, 2010 (AR 139-47).

In April 2012, Pitman filed a new application for DIB, alleging disability as of January 8,

2008. (AR 213-14). Pitman's claim was denied initially and upon reconsideration. (AR 159-

66). A hearing was held on October 1, 2013, before administrative law judge William D.

Pierson (the "ALJ"), at which Pitman, who was represented by counsel, and a vocational expert

---

[1] All parties have consented to the Magistrate Judge. (DE 13); *see* 28 U.S.C. § 636(c).

("VE") testified. (AR 54-106). On April 22, 2014, the ALJ rendered another unfavorable decision to Pitman, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of jobs in the economy. (AR 23-46). Pitman's request for review was denied by the Appeals Council (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Pitman filed a complaint with this Court in November 2015, seeking relief from the Commissioner's decision.[2] (AR 982-83). In March 2017, the Court entered an Opinion and Order reversing the Commissioner's decision and remanding the case for further proceedings. (AR 1001-25). In August 2017, the Appeals Council remanded the case to the ALJ (AR 1027-30), and the ALJ conducted a new hearing (AR 908-50). On June 14, 2018, the ALJ issued another unfavorable decision to Pitman. (AR 862-92). Pitman opted not to seek review by the Appeals Council, and the ALJ's decision dated June 14, 2018, became the Commissioner's final decision. (AR 859-61).

On August 17, 2018, Pitman filed suit here, appealing the Commissioner's final decision. (DE 1). In the appeal, Pitman alleges that the ALJ: (1) improperly discounted the opinion of Dr. Julian Freeman, who reviewed Pitman's record more than five years after her date last insured and issued a report dated January 22, 2018; (2) improperly evaluated whether Pitman met Listing 14.09B, inflammatory arthritis, as of her date last insured; (3) improperly found that Pitman did not equal Listing 3.02A, chronic respiratory disorders, as of her date last insured; (4) failed to adequately account for Pitman's deficits in concentration, persistence, or pace in the residual

---

[2] In December 2016, Pitman filed an application for Supplemental Security Income ("SSI"). (AR 862). She was found disabled as of her application date because she met the criteria of Listing 3.02A, chronic respiratory disorders. (AR 862, 994-1000). Accordingly, only Pitman's request for DIB is before the Court in this appeal.

2

functional capacity ("RFC") assessment and the hypothetical posed to the VE; and (5) improperly discounted Pitman's symptom testimony.  (DE 18 at 9-25).

At the time of the ALJ's decision, Pitman was 52 years old (AR 156, 892); had a high school education (AR 247); and had work experience as a nursery school attendant, a housekeeping cleaner, a woodworking machine offbearer, a general inspector, and a store laborer (AR 353).  Pitman alleges disability due to:  cervical and lumbar degenerative disc disease, a history of asthma and bronchitis, chronic obstructive pulmonary disease ("COPD"), a history of right (dominant hand) carpal tunnel release surgery, left carpal tunnel syndrome, left shoulder pain, fibromyalgia, insomnia, sleep apnea, obesity, inflammatory arthritis, major depressive disorder, and post-traumatic stress disorder ("PTSD").  (DE 18 at 3).

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

#### *A. The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment or combination of impairments meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work

in the national economy.[3]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)

(citations omitted); 20 C.F.R. § 404.1520.  An affirmative answer leads either to the next step or,

on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d

881, 886 (7th Cir. 2001) (citation omitted).  A negative answer at any point other than step three

stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.* (citation omitted).

The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

Commissioner.  *Clifford*, 227 F.3d at 868 (citation omitted).

## B.  The Commissioner's Final Decision

On June 14, 2018, the ALJ issued a decision that ultimately became the Commissioner's

final decision.  (AR 862-92).  At step one, the ALJ concluded that Pitman had not engaged in

substantial gainful activity after her alleged onset date of January 8, 2008, through her date last

insured of June 30, 2012.  (AR 865).  At step two, the ALJ found that Pitman had the following

severe impairments through her date last insured:  mild degenerative disc disease and

spondylosis of the cervical spine with cervical radiculopathy, mild thoracic and lumbar

degenerative disc disease, a history of asthma and bronchitis, COPD, a history of right (dominant

hand) carpal tunnel release surgery, left carpal tunnel syndrome, left shoulder pain, fibromyalgia,

insomnia, obstructive sleep apnea, obesity, inflammatory arthritis, major depressive disorder,

PTSD, and attention deficit disorder.  (AR 866).

At step three, the ALJ concluded that Pitman did not have an impairment or combination

of impairments severe enough to meet or equal a listing.  (AR 867-83).  Before proceeding to

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations.  20 C.F.R. §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

step four, the ALJ determined that Pitman's symptom testimony was not entirely consistent with the medical evidence and other evidence of record with respect to her limitations as of her date last insured. (AR 888-89). The ALJ assigned Pitman the following RFC:

> [T]hrough the date last insured, the claimant has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a). She could lift, carry, push and pull ten pounds frequently and occasionally. She could not use her upper extremities (hands/arms) to reach and perform fine and gross manipulati[on] on a constant basis, but could use them for frequent fingering; feeling; gripping; fine manipulation of small objects such as a pen, computer mouse, or paperclip; gross manipulation with handling, grasping, turning, and gripping of larger objects; and reaching in all directions. The claimant could sit for at least six hours in an eight-hour workday and stand and/or walk for two hours in an eight-hour workday. As to postural changes, the claimant could occasionally crouch, kneel, balance, use ramps and stairs, and bend and stoop, in addition to what is required to sit, but could not crawl or climb ladders, ropes, or scaffolds. The claimant could tolerate less than occasional exposure to excessive/concentrated airborne particulate, dusts, fumes and gases and excessive heat, humidity and cold such as when working outside or within a sawmill, boiler room, chemical plant, green house, refrigerator or sewage plant. The claimant had the mental [RFC to] perform tasks that involved simple instructions, defined as tasks and instructions that can be learned through short demonstration, or when beyond short demonstration, up to and including one month, or in other words, special vocational preparation (SVP) levels 1 and 2. The claimant could make the judgments and apply the common sense understanding required to carry out such instructions and tasks with both tasks and instructions falling within the realm of reasoning levels 1, 2 and 3. The claimant could remember the associated work like procedures. The claimant could maintain the focus, persistence, concentration, pace and attention required to engage in such tasks for two hour increments, and for eight hour work days, and with the confines of normal work breaks and lunch periods.

(AR 883-84). Based on the assigned RFC and the VE's testimony, the ALJ found at step four that Pitman was unable to perform her past relevant work through her date last insured. (AR

890).  However, at step five the ALJ found that through her date last insured Pitman could perform a significant number of unskilled, sedentary jobs in the economy, including addresser, table worker, document preparer, compact assembler, and call out operator.  (AR 891).  Therefore, Pitman's application for DIB was denied.  (AR 891-92).

## C.  Dr. Freeman's Opinion

Several of Pitman's arguments raised on appeal rely on the opinion of Dr. Freeman, a non-examining physician who reviewed Pitman's record and issued a retrospective 15-page report on January 22, 2018—more than five years after Pitman's date last insured.  (AR 2629-43).  The Court will begin with Pitman's argument that the ALJ improperly discounted the limitations assigned by Dr. Freeman.

In his report, Dr. Freeman opined that as of June 5, 2010, through his report date, Pitman:  (1) could lift, carry, push, or pull five pounds with extreme rarity for only a few seconds at a time, a few times a day, with at least an hour of rest thereafter; (2) could lift, carry, push, or pull less than frequently; (3) could walk or stand one to two minutes at a time with at least 30 minutes rest thereafter, and walk or stand no more than 20 minutes in total per day; (4) could rarely (less than five percent of the time) perform position changes; (5) had a "slow and delayed (long lag time) initiation of any movements"; (6) could rarely use hands and fingers for all activities, "at approximately 1/4 normal rate"; (7) could climb only a few steps at a reduced rate, on a very rare basis (a few times a day); (8) must avoid any exposure to respiratory irritants, cold, or very dry air; and (9) had a "general rate of physical activities approximately 1/3-1/4 normal for all activities."  (AR 2638).

The ALJ considered these limitations penned by Dr. Freeman, but assigned them little

weight, explaining as follows:

> Dr. Freeman opined the claimant had very extreme limitations of function allegedly existing since June 5, 2010. Dr. Freeman reported the claimant could change position rarely or less then 5% of the time, and could only lift, carry, push and pull 5 pounds only with "extreme rarity" and only for a "few seconds at a time" and only a "few times a day" requiring a rest break for at least one hour thereafter. First, outside of noting diagnoses, he offers little explanation. Second, these are extreme work limitations and are unsupported by the treatment notes as of 2010 or as of 2012. The objective medical findings, or lack thereof, within the treatment notes, including those from 2011 do not reflect supportive objective medical findings. Again, this would be speculation.

(AR 887). When assigning Pitman's RFC, the ALJ instead relied upon the functional capacity evaluation completed by the physical therapist on January 8, 2008, which revealed that Pitman had the capacity to frequently lift, push, and pull in the range of 10 to 25 pounds; and allowed for frequent, but not constant, reaching with the upper extremities. (AR 887 (citing AR 1878-85)). The ALJ further observed that this functional capacity evaluation was consistent with the permanent work restrictions assigned by Dr. Thomas Lazoff, Pitman's treating pain management specialist, on January 14, 2008. (AR 887 (citing AR 1886-88)).

Pitman challenges the ALJ's discounting of Dr. Freeman's limitations. Pitman first takes issue with the ALJ's statement that Dr. Freeman's report "offers little explanation" "outside of noting diagnosis." (AR 887). Given that Dr. Freeman penned a 15-page report on Pitman's case, the Commissioner concedes that the ALJ may have erred in making this statement. (DE 19 at 4). But the Commissioner further asserts such error was harmless, given that the ALJ provided another good reason to discount Dr. Freeman's opinion: the objective medical findings in the treatment notes dated contemporaneous with Pitman's date last insured do not support the extreme limitations opined by Dr. Freeman retrospectively. (DE 19 at 4); *see Shramek*, 226 F.3d

at 814 (explaining that harmless errors are those that do no ultimately impact the outcome of the determination (citation omitted)).

In a nutshell, Pitman contends that the restrictions penned retrospectively by non-examining Dr. Freeman more than five years after the relevant period should be given more weight than the limitations assigned by Pitman's examining and treating medical sources contemporaneous with the relevant period. (DE 20 at 6). Pitman, citing *Moreno v. Berryhill*, 882 F.3d 722, 729 (7th Cir. 2018), claims that the medical source opinions during the relevant period were not aware of the new diagnosis of inflammatory arthritis assigned by Dr. Freeman, and that this new diagnosis is important because as Dr. Freeman explains, the disease "makes sustaining activity difficult." (DE 20 at 6).

*Moreno*, however, is not directly relevant to the instant circumstances. In *Moreno*, the Seventh Circuit Court of Appeals found that the ALJ had erred by relying on a "stale" reviewing physician's opinion rendered seven years prior to the ALJ's decision. 882 F.3d at 729. But the claimant's date last insured was not an issue in *Moreno*. Here, Pitman's insured status expired on June 30, 2012, which decreases the relevancy of any opinions rendered remote in time from that date. *See, e.g.*, *Castle v. Colvin*, 557 F. App'x 849, 854 (11th Cir. 2014) (finding the ALJ should have afforded less weight to a medical source opinion dated two years after the claimant's date last insured, where the opinion was inconsistent with evidence contemporaneous with the relevant period); *Black v. Acting Comm'r of Soc. Sec. Admin.*, No. 17-cv-350-JD, 2018 WL 2002484, at *4 (D.N.H. Apr. 30, 2018) (affirming the ALJ's discounting of a treating medical source opinion dated four years after the claimant's date last insured, where the opinion was inconsistent with evidence contemporaneous with the relevant period); *Hayes v. Astrue*, No.

07-710, 2007 WL 4456119, at *2 (E.D. Pa. Dec. 17, 2007) (same). As such, the ALJ chose to rely on assessments by doctors who actually examined and treated Pitman contemporaneous with the relevant period, including Dr. Monica Reddy, Dr. Venkata Kancherla, and Dr. David Lutz. (AR 874-78). Dr. Reddy a rheumotologist, examined Pitman in September 2012 and found normal upper and lower extremities with "absolutely no clinical features" of inflammatory arthritis. (AR 638-41, 878). Dr. Kancherla examined Pitman in June 2012 and found no signs of significant deficits of the upper extremities. (AR 528-31, 878). And treatment records from January 2010 through September 2012, including those of Dr. Lutz, showed that Pitman had clear lungs and no respiratory distress. (AR 401, 439, 529, 554, 719, 728, 868-70).

In sum, the ALJ adequately articulated why he assigned more weight to the medical source opinions of record who examined and treated Pitman contemporaneous with the relevant period, and less weight to the retrospective opinion of non-examining Dr. Freeman dated more than five years after Pitman's date last insured. The ALJ's rationale for doing so is sufficiently supported by the record. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (stating that the ALJ must sufficiently articulate his assessment of the evidence to assure the court that he has considered the important evidence and allow the court to trace his path of reasoning). Consequently, Pitman's argument equates to merely a plea to the Court to reweigh the evidence, which it cannot do. *See Clifford*, 227 F.3d at 869 (stating that courts "do not weigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner" (citations omitted)). The ALJ's discounting of the extreme restrictions in Dr. Freeman's opinion is supported by substantial evidence, and thus, the ALJ's weighing of the medical source opinions of record does not necessitate a remand.

### D. Listing 14.09B

Pitman also challenges the ALJ's step-three finding that she did not meet Listing 14.09B, inflammatory arthritis, as of her date last insured. She again faults the ALJ for rejecting the opinion of Dr. Freeman, who wrote in his January 2018 report that Pitman met the criteria of Listing 14.09B no later than June 5, 2010.

"Under a theory of presumptive disability, a claimant is eligible for benefits if [she] has an impairment that meets or equals an impairment found in the Listing of Impairments." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. § 404.1520(d); 20 C.F.R Pt. 404, Subpt. P, App'x 1)). "The listings specify the criteria for impairments that are considered presumptively disabling." *Id.* (citing 20 C.F.R. § 404.1525(a)). Specifically, Listing 14.09B requires that a claimant establish four elements: (1) inflammatory arthritis; (2) inflammation or deformity in one or more major peripheral joints; (3) involvement of two or more organs/body systems with one of the organs/body systems involved to be at least a moderate level of severity; and (4) at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 14.09B.

The Commissioner argues that the ALJ found that Pitman did not meet Listing 14.09B as of her date last insured because, among other things, she did not show involvement of two or more organ body systems with inflammatory arthritis by that date. (AR 878-79); *see Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." (citation omitted)). Pitman contends, however, that Dr. Freeman correctly opined that Pitman met Listing 14.09B no later than June 5,

2010, because her respiratory problems and wrist inflammation were the result of inflammatory arthritis, rather than COPD and carpal tunnel syndrome. (AR 2635-36).

The ALJ's conclusion that Pitman did not meet Listing 14.09B as of her date last insured is adequately supported. The ALJ observed that Dr. Fahd Saeed, Pitman's treating rheumatologist at the time, did not opine that Pitman's respiratory problems were caused by inflammatory arthritis during the relevant period. (AR 878-79). Rather, Dr. Saeed's notes, as well as other contemporaneous notes of record, reflect a diagnosis of COPD with respect to Pitman's respiratory problems. (AR 817-58; *see also* AR 509, 658, 2441-45, 2454-56). In short, Pitman cannot meet the third element of Listing 14.09B by merely showing that she has two or more unrelated impairments.

Thus, Pitman's argument that the ALJ erred by concluding that she did not meet Listing 14.09B amounts to simply another invitation for the Court to reweigh the evidence in the hope that it will assign more weight to Dr. Freeman's opinion than the contemporaneous medical evidence of record. Again, the Court cannot accept Pitman's invitation. *See Clifford*, 227 F.3d at 869. The ALJ adequately articulated why he discounted Dr. Freeman's retrospective, non-examining opinion, and the ALJ's finding that Pitman did not meet the criteria of Listing 14.09B as of her date last insured is supported by substantial evidence. (AR 878-79). Consequently, Pitman's argument concerning Listing 14.09B does not necessitate a remand of the case.

### E. Listing 3.02A

Listing 3.02A, chronic respiratory disorders, requires two elements: (1) a chronic respiratory disorder other than cystic fibrosis; and (2) a forced expiratory volume ("FEV1") less than or equal to the value in Table I-A or I-B for the claimant's age, gender, and height without

shoes. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 3.02A. The parties seem to agree that as of her

date last insured, Pitman's COPD met the first element of the Listing, and conversely, that her

FEV1 did not meet the second element of the Listing.[4] (DE 18 at 17; DE 19 at 9).

Having said that, Pitman challenges the ALJ's conclusion that she did not medically

equal the criteria of Listing 3.02A as of her date last insured. *See Barnett*, 381 F.3d at 668 ("A

claimant may also demonstrate presumptive disability by showing that her impairment is

accompanied by symptoms that are equal in severity to those described in a specific listing."

(citing 20 C.F.R. § 404.1526(a))). Pitman again relies upon Dr. Freeman's retrospective report

dated January 22, 2018, to support her argument. Dr. Freeman, relying upon Pitman's

pulmonary function test dated May 8, 2012, opined that Pitman had a combined impairment from

pulmonary obstruction and diffusion that medically equals Listing 3.02A no later than June 5,

2010. (AR 868, 2636-37).

But the ALJ discounted Dr. Freeman's opinion because Dr. Freeman did not

acknowledge that Pitman's pulmonary function test was "within 30 days of an exacerbation of

[COPD]," which the ALJ considered contrary to the requirements set out in the preamble for

impairments of the respiratory system under Listing 3.00E. (AR 468, 868, 2397). Pitman

challenges the ALJ's interpretation of the language of the preamble, which states:

> 2. We have the following requirements for spirometry under these
> listings:
>
> a. You must be medically stable at the time of the test. Examples
> of when we would not consider you to be medically stable include
> when you are:

---

[4] As stated earlier, Pitman applied for SSI in December 2016 and was found disabled as of her application date because she met Listing 3.02A. (AR 862, 994-1000). Accordingly, Pitman challenges only the ALJ's conclusion that she did not meet or equal Listing 3.02A four years earlier, prior to her date last insured.

(i) Within 2 weeks of a change in your prescribed respiratory medication.

(ii) Experiencing, or within 30 days of completion of treatment for, a lower respiratory tract infection.

(iii) Experiencing, or within 30 days of completion of treatment for, an acute exacerbation (temporary worsening) of a chronic respiratory disorder. Wheezing by itself does not indicate that you are not medically stable.

(iv) Hospitalized, or within 30 days of a hospital discharge, for an acute myocardial infarction (heart attack).

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 3.00E(2). According to the ALJ, Pitman's pulmonary function test of May 8, 2012, is invalidated by the language of the preamble because she was hospitalized for an exacerbation of COPD on or about May 19, 2012, which was within 30 days of the test. (AR 868). Pitman, however, contends that the preamble language includes only those exacerbations that occur within 30 days *before* spirometry testing. (DE 20 at 2-4). Therefore, as Pitman sees it, she was "medically stable" at the time of her May 8, 2012, pulmonary function test. (DE 20 at 2-4).

Neither party cites any authority for their respective interpretations of the preamble. (DE 19 at 9-11; DE 20 at 2-4). Having considered the plain language of the preamble, the Court agrees that the ALJ's interpretation of the preamble was reasonable, and that the ALJ had a sufficient basis upon which to invalidate Pitman's pulmonary function test of May 8, 2012.

Regardless, the ALJ also considered that Pitman experienced significant improvement in her respiratory condition after her hospital admission for treatment of her COPD in May 2012. (AR 870). The ALJ observed that on May 31, 2012, Pitman told Dr. Michele Thurston that she felt better, but that still became short of breath if she exerted herself too much; Pitman continued

to smoke despite using nicotine patches.  (AR 870 (citing AR 438)).  An exam was essentially normal, indicating that Pitman breathed easily and that her lungs were clear to auscultation and without wheezes.  (AR 870 (citing AR 438)).  Similarly, in early June 2012, a consultative examination by Dr. Kancherla reflected improvement in Pitman's breathing problems.  (AR 870 (citing AR 528-30)).  Pitman's lungs were clear to auscultation, and she did not have any rales, rhonchi, or wheezes; she looked young and healthy, could walk for a block, and smoked two packs a day.  (AR 870 (citing AR 528-30)).

The ALJ also duly considered that an examination by Dr. Eustace Fernandes, a pulmonary specialist, in later June 2012, noted a number of abnormalities such as 93% oximetry, dyspnea upon walking into the exam room, diffusely decreased breath sounds, and increased AP diameter.  (AR 871 (citing AR 650-52)).  But despite these abnormalities, Pitman did not use her accessory muscles to breath.  (AR 871 (citing AR 650-52)).  Dr. Fernandes diagnosed COPD and gave her Spiriva samples, noting that Pitman had never tried the medication.  (AR 871 (citing AR 674-76)).  A few weeks later, Pitman's exam was essentially the same, other than 94% oximetry; she reported that she felt better with Spiriva but was using her nebulizer four times a day.  (AR 871 (citing AR 671-73)).  Dr. Fernandes discontinued Spiriva, prescribed Theophylline, and told Pitman to stop smoking.  (AR 871 (citing AR 671-73)).  Examinations by Dr. Lutz and Dr. Thurston in July 2012, each showed that Pitman was breathing easily and that her lungs were clear to auscultation and without wheezes; she reported that she was still taking Chantix and had been doing "pretty good" with quitting smoking.  (AR 871 (citing AR 554)).

In September 2012, lab work showed that Pitman had a low Theophylline level, and Dr. Fernandes increased Pitman's dosage of this medication.  (AR 871 (citing AR 667)).  A recheck

in December 2012 showed Pitman's Theophylline level was back within the normal range. (AR 871 (citing AR 662)). An examination by Dr. Reddy, a rheumotologist, that same month observed that Pitman had clear breath sounds bilaterally. (AR 871 (citing AR 636-37)). In October 2012, an annual wellness exam by Dr. Thurston reflected that Pitman was breathing easily, and her lungs were clear without wheezes; she was smoking four cigarettes a day and hoping to restart Chantix the next year. (AR 871 (citing AR 786)). An exam in November 2012 by Dr. Lutz again noted that Pitman had clear lungs. (AR 871 (citing AR 758-59)).

After summarizing this medical evidence that was contemporaneous with Pitman's date last insured, the ALJ assessed that Pitman had an exacerbation of COPD shortly after her May 8, 2012, pulmonary function test, but that her symptoms and COPD exacerbation then improved. (AR 871). More specifically, the ALJ stated: "[T]he severity of such pulmonary test results and equivalent level function is not reflected in the prior or post treatment notes overall and the severity of symptoms reflected in May 2012 were resolved as of June and July 2012." (AR 872). The ALJ further observed that while Dr. Fernandes's examinations in June and July 2012 showed a number of abnormalities, he prescribed only conservative treatment—Spiriva and Theophylline. (AR 872). Based on this contemporaneous evidence, the ALJ concluded that Pitman did not meet or equal a listing prior to her date last insured, including Listing 3.02A. (AR 872).

The ALJ also explained his rationale for discounting Dr. Freeman's opinion that Pitman equaled Listing 3.02A as of June 5, 2010. (AR 872). The ALJ articulated that Dr. Freeman's time frame of onset equivalence was an "estimate" based upon testing in the month of exacerbation (May 2012), and "not based on actual medical facts within the record but based on

'usual rate of progression' which does not necessarily correlate to the claimant's actual specific set of medical facts." (AR 872). The ALJ further explained that to the extent that Dr. Freeman opined that Pitman met Listing 3.02A because of the combination of COPD, emphysema, and diffusion defect, the treatment records from 2011 and May 2012 do not reflect a diagnosis of emphysema. (AR 873 (citing AR 438-86)). Rather, Dr. Fernandes diagnosed Pitman with COPD. (AR 873 (citing AR 2070, 2377)). Accordingly, the ALJ adequately articulated and supported his decision to assign more weight to the diagnosis of COPD assigned by Dr. Fernandes, Pitman's treating pulmonologist during the relevant period, than the diagnosis assigned retrospectively by non-examining Dr. Freeman more than five years after Pitman's date last insured.

In sum, the ALJ adequately articulated his step-three finding that Pitman did not meet or equal Listing 3.02A, chronic respiratory disorders, prior to her date last insured, and his finding is supported by substantial evidence—in particular, the medical evidence contemporaneous with the relevant period. Consequently, the ALJ's step-three finding will not be disturbed.

### F. Pitman's Mental RFC

Additionally, Pitman asserts that the ALJ failed to adequately account for her difficulties in maintaining concentration, persistence, or pace when assigning the mental RFC and posing hypotheticals to the VE. Contrary to Pitman's assertion, the assigned RFC, which was adequately incorporated into the hypotheticals posed to the VE, sufficiently account for Pitman's mental limitations prior to her date last insured.

At steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories

identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). Relevant to this appeal, the "paragraph B" criteria consist of four broad functional areas: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3); *see, e.g.*, *Johnnie M. v. Berryhill*, No. 2:18-cv-00066-MJD-JMS, 2019 WL 521176, at *13 (S.D. Ind. Feb. 11, 2019); *Brynelson v. Berryhill*, 329 F. Supp. 3d 629, 638 n.6 (N.D. Ill. Sept. 14, 2018). "[T]he limitations identified in the 'paragraph B' criteria and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." SSR 96-8p, 1996 WL 374814, at *4; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011). "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. § 404.1545(a)(1). "The RFC assessment must be based on *all* of the relevant evidence in the case record . . . ." SSR 96-8p, 1996 WL 374184, at *5; *see* 20 C.F.R. § 404.1545(a)(3). That is, "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5; *see Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012).

Here, when assessing the "paragraph B" criteria at step three, the ALJ found that Pitman

had "less than marked limitations" in her abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.  (AR 881-82).  When proceeding to step four, the ALJ assigned Pitman the following mental RFC, in relevant part:

> The claimant had the mental [RFC to] perform tasks that involved simple instructions, defined as tasks and instructions that can be learned through short demonstration, or when beyond short demonstration, up to and including one month, or in other words, special vocational preparation (SVP) levels 1 and 2.  The claimant could make the judgments and apply the common sense understanding required to carry out such instructions and tasks with both tasks and instructions falling within the realm of reasoning levels 1, 2 and 3.  The claimant could remember the associated work like procedures.  The claimant could maintain the focus, persistence, concentration, pace and attention required to engage in such tasks for two hour increments, and for eight hour work days, and with the confines of normal work breaks and lunch periods.

(AR 883-84).

Pitman asserts that the foregoing restriction is inadequate because it did not expressly include the ALJ's finding at step three that she had difficulties in maintaining concentration, persistence, or pace.[5]  First, Pitman argues that incorporating terms like "simple instructions" on their own will not necessarily exclude from the VE's consideration those jobs that present significant problems of concentration, persistence, or pace.

The Seventh Circuit has instructed that "for most cases, the ALJ should refer expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes

---

[5] Pitman argues that the ALJ failed to account for her "moderate" difficulties in concentration, persistence, or pace.  (DE 18 at 19-20).  While the ALJ articulated in his 2014 decision that Pitman had "moderate" difficulties in concentration, persistence, or pace (AR 28), he did not articulate the same in his 2018 decision, finding instead that Pitman had "less than marked" difficulties in concentration, persistence, or pace (AR 882).

substantial evidence of the jobs a claimant can do." *O'Connor-Spinner v. Astrue*, 627 F.3d 614,

620-21 (7th Cir. 2010). Having said that, the Seventh Circuit has not insisted "on a per se

requirement that this specific terminology ('concentration, persistence and pace') be used in the

hypothetical in all cases." *Id.* at 619. The court explained:

> We also have let stand an ALJ's hypothetical omitting the terms
> 'concentration, persistence and pace' when it was manifest that the
> ALJ's alternative phrasing specifically excluded those tasks that
> someone with the claimant's limitations would be unable to
> perform. We most often have done so when a claimant's
> limitations were stress- or panic-related and the hypothetical
> restricted the claimant to low-stress work.

*Id.* at 619 (citing *Arnold v. Barnhart*, 473 F.3d 816, 820 (7th Cir. 2007) (upholding a

hypothetical restricting the claimant to work involving low production standards and a low-stress

environment, where the claimant's difficulties with concentration, persistence, or pace arose

from stress-induced headaches, frustration, and anger); *Johansen v. Barnhart*, 314 F.3d 283,

288-89 (7th Cir. 2002) (allowing a hypothetical formulated in terms of "repetitive, low-stress"

work to stand, where the claimant's deficits in concentration, persistence, or pace stemmed from

a panic disorder); *Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002) (finding that the

ALJ's restricting the claimant from jobs "involving complex work processes or unusual levels of

stress" adequately accommodated the claimant's concentration problems arising, in part, from a

panic disorder)).

"In most cases, however, employing terms like 'simple, repetitive tasks' on their own

will not necessarily exclude from the VE's consideration those positions that present significant

problems of concentration, persistence and pace." *Id.* at 620 (finding that a restriction to

repetitive tasks with simple instructions did not necessarily account for the claimant's

depression-related problems in concentration, persistence, and pace) (collecting cases); *see also Warren v. Colvin*, 565 F. App'x 540, 544 (7th Cir. 2014) (finding that a limitation to "simple, repetitive tasks" did not adequately account for the claimant's concentration problems arising from depression and borderline intellectual functioning); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (concluding that a limitation to unskilled work did not sufficiently account for the claimant's concentration problems stemming from depression and a psychotic disorder). "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620 (citing *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985)).

"Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85-15, 1985 WL 56857, at *6. Accordingly, the RFC and hypotheticals "must account for *both* the complexity of the tasks and the claimant's ability to stick with a task over a sustained period." *Warren*, 565 F. App'x at 544 (emphasis added) (citations omitted); *see Yurt*, 758 F.3d at 858 (articulating that an RFC for unskilled work "by itself does not provide any information about [the claimant's] mental condition or abilities").

Here, the ALJ crafted an RFC and step-five hypotheticals that addressed both the complexity of the tasks that Pitman could perform and her ability to complete such tasks over a sustained period. To address complexity, the ALJ limited Pitman to "tasks that involved simple

instructions" as of her date last insured—specifically, SVP levels 1 and 2, stating that Pitman had the judgment, common sense, and memory to carry out such tasks. (AR 883). To address the ability to stick with a given task over a sustained period, the ALJ stated that Pitman "could maintain the focus, persistence, concentration, pace and attention required to engage in such tasks for two-hour increments, and for eight-hour work days, and with the confines of normal work breaks and lunch periods." (AR 883-84). Thus, the ALJ did not run afoul of the Seventh Circuit's instruction in *O'Connor-Spinner* to address both the complexity of the tasks the claimant can perform and the claimant's ability to stick with the tasks over a sustained period. 627 F.3d at 620.

"[T]he RFC determination is one firmly within the ALJ's discretion to determine, so long as he sufficiently articulates his reasoning and the record adequately supports his conclusion." *Terry v. Astrue*, No. 3:09-CV-503 JD, 2011 WL 855346, at *17 (N.D. Ind. Mar. 7, 2011) (citing 20 C.F.R. §§ 404.1546(c), 404.1527(e)(2) and collecting cases). Here, the ALJ explained that while Pitman was actually capable of performing tasks at SVP levels 3 and 4, which are consistent with semi-skilled work, she would likely decompensate in pace and persistence, and eventually concentration; to account for this, the ALJ limited Pitman to less complex tasks at SVP levels 1 and 2. (AR 884). Additionally, the ALJ considered that Pitman's pain would interfere with her concentration and performance at higher levels of exertion, and to account for her pain, he limited her to sedentary work. (AR 885).

Thus, it is readily apparent that the ALJ thoroughly considered Pitman's difficulties in concentration, persistence, or maintaining pace when assigning the RFC and when posing the hypotheticals to the VE. Ultimately, the ALJ concluded that despite Pitman's mental difficulties in this arena, she still had adequate concentration, persistence, and pace to sustain the

performance of simple, routine, and repetitive tasks throughout an eight-hour workday, within the confines of normal work breaks and lunch periods. *See, e.g.*, *Elliott v. Berryhill*, No. 1:16-cv-309-WTL-DML, 2017 WL 3613671, at *2-3 (S.D. Ind. Aug. 23, 2017) (finding that the ALJ avoided the *O'Connor-Spinner* error by explaining that the claimant's ability to concentrate was higher when limited to simple and repetitive tasks). The Court concludes that in this instance, the mental restrictions in the RFC, taken together, adequately account for Pitman's credible concentration, persistence, and pace limitations prior to her date last insured. *See Cihlar v. Berryhill*, 706 F. App'x 881, 882 (7th Cir. 2017) (concluding that the ALJ's hypotheticals to the VE "adequate account[ed] for Cihlar's credible concentration and persistence limitations" even though "the ALJ did not use the magic words 'concentration' or 'persistence'").

Consequently, Pitman's fourth argument also does not necessitate a remand of the Commissioner's final decision.

### G. Pitman's Symptom Testimony

Lastly, Pitman purports to challenge the ALJ's consideration of the credibility of her symptom testimony "in light of Dr. Freeman's opinion." (DE 20 at 6). But Pitman's cursory assertion does not actually raise any meaningful argument about the ALJ's credibility analysis. Rather, Pitman merely asserts that if the Court finds that the ALJ erred when considering Dr. Freeman's opinion, then that error may have tainted the ALJ's assessment of the credibility of her symptom testimony, necessitating that it, too, should be reconsidered upon remand. (DE 18 at 25).

Because the Court has already concluded that the ALJ's discounting of Dr. Freeman's retrospective opinion is supported by substantial evidence, Pitman's cursory argument challenging the ALJ's credibility determination also fails. Therefore, the Commissioner's final

decision will be AFFIRMED.

## IV.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED.  The Clerk

is directed to enter a judgment in favor of the Commissioner and against Pitman.

SO ORDERED.

Entered this 30th day of May 2019.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge